UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

URBCAM/WSU I, LLC,

       Plaintiff,

                                      Case No. 12-CV-15686
vs.                                  HON. GEORGE CARAM STEEH

LEXINGTON INSURANCE CO.,

       Defendant.

_____/

**ORDER AFFIRMING IN PART AND REVERSING IN PART THE
MAGISTRATE JUDGE'S ORDER (Doc. 39), GRANTING
PLAINTIFF'S OBJECTIONS (Doc. 42), AND
<u>OVERRULING DEFENDANT'S OBJECTIONS (Doc. 43)</u>**

This breach of contract dispute arises out defendant Lexington Insurance Company's ("Lexington's") refusal to pay business loss expenses allegedly incurred when an apartment building owned by plaintiff UrbCamCom/WSU I, LLC ("UCC") sustained water damage. Lexington filed a motion to amend its answer to add an affirmative defense and counterclaim alleging fraud. The magistrate judge denied the motion as to the counterclaim but granted the motion as to the affirmative defense. UCC objects to the order as it relates to the affirmative defense. Lexington objects to the order as it relates to its counterclaim. Because any amendment to allow Lexington to add a fraud counterclaim or affirmative defense would be futile, Lexington's motion to amend must be denied in its entirety. Accordingly, the magistrate judge's order shall be affirmed, as to the denial of Lexington's motion to add a counterclaim, and shall be reversed as to the allowance of Lexington's motion to add an affirmative defense.

-1-

## I. Background

UCC owns a new upscale apartment building, known as the Union at Midtown, in the area of Wayne State University which it rents to college students.  On January 16, 2012, two fire sprinklers ruptured causing the building to sustain severe water damage rendering the apartments uninhabitable.  On March 14, 2012, UCC submitted to Lexington a proof of loss for damages to the apartment building in the amount of approximately $5.6 million.  Lexington made a partial payment of $1.8 million, disputed the total amount sought, and pursuant to the policy and Michigan law, the parties submitted their disagreement to an Appraisal.  At the Appraisal, each side was represented by counsel, relied on their own appraiser, and submitted testimony of five experts.  In addition, the parties' appraisers agreed on a neutral umpire.  After hearings and inspections of the building, the Appraisal Panel issued a partial appraisal award on October 10, 2012, which provided for replacement cost value of repairs in the amount of $5.27 million and an actual cash value award of $5.04 million.  At no point during the Appraisal process did Lexington allege fraud on the part of UCC's counsel, appraiser, or experts.  As a result of the Appraisal, Lexington paid UCC an additional $3.2 million actual cash value payment on the building loss on November 8, 2012.  In addition, because the apartment complex was uninhabitable, Lexington made payments exceeding $900,000 for business income loss and extra expenses.

As of September 30, 2012, however, Lexington stopped paying lost business income.  UCC claimed additional amounts were owing for business income loss and extra expenses which Lexington denied.  UCC sought to submit the dispute to an Appraisal but Lexington claimed that the disagreement was a coverage issue, which

could not be resolved through the Appraisal process.  UCC then filed this lawsuit

seeking a declaratory judgment that all disputes concerning the business loss claim be

submitted to an Appraisal Panel, that this court determine the "period of restoration" as

defined in the policy, and enter a judgment in the amount of the Appraisal award plus

interest.

Once Lexington stopped paying business loss damages in September, 2012,

UCC experienced a cash flow hardship and endeavored to repair the apartment building

as fast as possible so that it could attract tenants for the 2013 school year.  In doing so,

UCC decided to first repair those areas that were critical to re-letting the building,

putting off those repairs that were not as critical such as exterior sheathing and HVAC

repair.  UCC retained the Alan Group to make the repairs which it did by May 1, 2013

for approximately $3 million dollars.  UCC was able to fully rent the building by August

20, 2013.

On October 21, 2013, Lexington filed a motion for leave to add a counterclaim

and to amend its answer by adding the affirmative defense that UCC has committed

fraud, on the theory that since repairs to date have only amounted to approximately $3

million, the evidence UCC presented in support of its $6.1 million building loss claim at

the Appraisal was a sham.  On November 21, 2013, the magistrate judge heard oral

argument on the motion.  Finding that the fraud claim could not survive a motion to

dismiss, and that Lexington's dilatoriness in filing the motion on the eve of the discovery

deadline weighed in favor of denying the motion to amend, the magistrate judge

properly denied Lexington leave to file its counterclaim, but incorrectly allowed

Lexington to add the affirmative defense of fraud.  Just as Lexington may not bring a

counterclaim incapable of withstanding a motion to dismiss, it shall be barred from

adding a defense based on the same frivolous allegation of fraud.[1]

In support of its objections to the magistrate judge's order, Lexington relies on an

estimate that the Alan Group prepared on October 26, 2012 which estimated that it

would cost approximately $3.5 million to complete repairs to the building.  (Doc. 52, Ex.

1), and on a December 2, 2012 e-mail in which UCC's public adjuster states that repairs

to the building would be around $3 million.  In reply to those objections, UCC has

submitted the affidavit of the president of the Alan Group, Brad Chojnacki, wherein he

states that the October, 2012 bid was a proposal to repair only those items necessary to

reopen the building as soon as possible because Lexington had ceased paying loss

business income.  (Doc. 54, Ex. E at ¶ 3).  According to his affidavit, "items deferred at

the Union's request were: replacing the building's exterior sheathing and performing

only partial repairs on the HVAC, plumbing, electrical, and other systems that would get

the building operational, but not restore it to its pre-loss state."  Id.  Chojnacki also

states in his affidavit that over $2 million in deferred work remains incomplete.  Id. at ¶

7.  In its objections, Lexington lists fifteen items showing differences between what UCC

estimated certain repairs would cost before the Appraisal Panel and what UCC has

actually expended to date.  In each instance, Chojnacki's affidavit explains that the

repairs have only been partially completed.  (Doc. 54, Ex. F at ¶ 10-11).

## II. Standard of Law

---

[1]UCC alleges that it lost an $8.1 million dollar refinancing of the building on
November 15, 2013, because of its obligation to disclose the pending fraud allegations.

A district court shall consider objections to a magistrate judge's non-dispositive orders, and shall modify or set aside any portion of the orders found to be clearly erroneous or contrary to law.  Fed. R. Civ. P. 72(a); 28 U.S.C. § 636(b)(1)(A).  A ruling is clearly erroneous if, upon review of the record, the district court is left with a definite and firm conviction that a mistake has been made.  Heights Comm. Congress v. Hilltop Realty, Inc., 774 F.2d 135, 140 (6th Cir. 1985), cert. denied, 485 U.S. 1019 (1986).  An abuse of discretion exists if a decision is based on an erroneous conclusion of law, the findings are clearly erroneous, or the decision is clearly unreasonable or arbitrary.  Youn v. Track, Inc., 324 F.3d 409, 420 (6th Cir. 2003).  A magistrate judge's determinations are, thus, afforded considerable deference, and will only be reversed when the reviewing court is left with "a definite and firm conviction that a mistake has occurred."  Ridenour v. Collins, 692 F. Supp. 2d 827, 829 (S.D. Ohio, 2010) (citations omitted).

### III. Analysis

Rule 15(a) provides that once the time period for amending a pleading once as a matter of right has passed, "a party may amend its pleading only with the opposing party's written consent or the court's leave.  A court need not grant leave to amend, however, where amendment would be 'futile.'"  Foman v. Davis, 371 U.S. 178, 182 (1962).  In determining whether to allow an answer to be amended to add an affirmative defense, the court is to consider if granting the motion would result in undue delay, prejudice the opposing party, and most importantly, whether "the amendment embodies a legally valid defense."  Phelps v. McClellan, 30 F.3d 658, 662-63 (6th Cir. 1994). In this case, it is clear that the proposed affirmative defense, like the counterclaim, is deficient on its face and therefore, any amendment would be futile and must be denied.

-5-

In order to prove fraud, Lexington must show that (1) UCC made a misrepresentation, (2) the misrepresentation was material, (3) Union knew the misrepresentation was false at the time that it was made or made the misrepresentation recklessly without any knowledge of its truth, and (4) Union made the misrepresentation with the intention of deceiving the insurer. Rayis v. Shelby Mut. Ins. Co., 80 Mich. App. 387, 393 (1978). In order to prove that an insured's fraudulent conduct voids the insurance policy, Michigan law requires proof that the insured must have actually intended to defraud the insurer. West v. Farm Bureau Mut. Ins. Co., 402 Mich. 67, 69 (1977). Lexington has failed to plead facts suggesting that UCC intended to defraud it in its proposed amended complaint and affirmative defenses.

When the court asked defense counsel at oral argument to specify those items for which UCC allegedly submitted fraudulent insurance claims, counsel identified sub-flooring as one example. When asked what evidence she relied upon to support her theory of fraud as to that item, she referred to the fact that Lexington has not as yet completed the repairs anticipated when this matter was before the Appraisal Panel, and on its own experts. The issue of the need to repair the sub-flooring was vigorously argued to the Appraisal Panel which considered the testimony of Lexington's experts and apparently, rejected it. This lawsuit should not be used to reopen the appraisal process absent compelling evidence of fraud which is absent here. Lexington also claims that UCC overstated the amount of overhead and profit that its contractor required. UCC's president has submitted an affidavit that the estimate for profit and overhead when submitting its August, 2012 claim was based on the industry standard percentage of ten percent, they have already collected nearly $350,000 in profit and

-6-

overhead, and will collect more once repairs are completed.  (Doc. 54, Ex. F at ¶ 10(o)).

Taking Lexington's allegations that UCC has spent less on repairs than it recovered

from the Appraisal Panel as true, Lexington still fails to state a valid counterclaim or

defense.

Lexington's fraud claim relies solely on the fact that UCC has not completed

repairs of all the damages awarded at the Appraisal.  UCC responds that it has

collected the actual cost value award, not the replacement cost value award, and that

under the policy, upon receipt of the actual cost value award it is not required to use the

funds to complete repairs.  Indeed, Lexington's own representative testified at his

deposition that under the policy, UCC was not required to use the actual cost value

award to make any repairs.  (Doc. 54, Ex. B at 97).  Lexington does not dispute that

UCC could just as easily have pocketed the money and maintained a damaged building.

Lexington has not refuted UCC's claim that the actual value of the repairs comes into

play only when and if UCC files a claim for replacement cost coverage.  In other words,

where the repairs cost more than the actual cost value award anticipated, the insured

can collect the shortfall in coverage by making a replacement cost value claim where

the policy so provides.  See Salesin v. State Farm Fire & Cas. Co., 229 Mich. App. 346,

365 (1998).  In this case, the policy specifically provides that "Actual Cash Value basis

[is] measured at the time of loss.  Actual Cash Value shall mean the lesser of (i)

replacement cost less depreciation or (ii) market value."  (Complaint, Ex. 1 at ¶

11(a)(3)).  UCC concedes that if it were to submit a false claim for real costs expended

which exceeded the costs it actually paid for repairs, that would, of course, amount to

fraud, but that is clearly not what has happened here.  In fact, UCC has not even filed a claim for its real costs.

UCC relies on Anika & Associates, Inc. v. Hartford Casualty Ins. Co., No. 11-12534, 2013 WL 1499532 (E.D. Mich. April 10, 2013) to support its claim that the costs it has expended to repair the building to date are irrelevant to the fraud question.  In that case, Judge Cohn dismissed defendant's fraud counterclaim and affirmative defense, which alleged that the policy holder misrepresented the actual replacement costs of its roof and siding, as it replaced the roof with a less expensive version than that lost, on the grounds that the policy holder did not make a replacement cost value claim at all. Id. at *8.  Judge Cohn found that the actual replacement cost was irrelevant to the actual value claim, which, under the policy, required calculating replacement costs for like quality and kind materials, and subtracting from that value the depreciation amount. Id.  Similarly, in this case, Lexington admits that under the policy, UCC was not required to make any repairs.  Accordingly, the amount it has spent to date on repairs is irrelevant and fails to support Lexington's fraud claim.

In this case, the Appraisal process resolved the question of the building loss as provided for under the policy and Michigan law.  MCL § 500.2833(m).  As part of that process, Lexington was represented by counsel, relied on its own appraiser, submitted the testimony of five experts, and agreed upon an impartial umpire to oversee the proceedings.  Now Lexington seeks to undo the results of that statutory process by coming in at the eleventh hour, after discovery has formally closed, to assert for the first time that the process was somehow infirm because UCC has not yet spent all of the insurance proceeds it received as part of that impartial process.  Lexington's argument

-8-

lacks merit and its motion to amend shall be denied in its entirety.  In addition, the magistrate judge properly denied the motion to amend to add the counterclaim of fraud, based in part, on Lexington's delay in filing its motion to amend until the eve of the discovery deadline, which had already been extended by agreement of the parties.  See Wade v. Knocksville Utilities Bd., 259 F.3d 452, 459 (6th Cir. 2001) (citation omitted) (heightened burden applies to party moving to amend where amendment sought at late stage of proceedings).

The magistrate judge explained his rationale for allowing the affirmative defense to be amended, but not allowing for the counterclaim to be pled, on the theory that the former is merely a "shield," while the latter is a  "sword."  However apt the analogy, the fact remains that there is no basis for the fraud allegation, whether pled as a counterclaim or an affirmative defense.  Accordingly, it was error to allow Lexington to amend its affirmative defenses to add a fraud claim.

For the reasons stated above, Lexington's objections (Doc. 43) are OVERRULED and UCC'S objections (Doc. 42) hereby are GRANTED.  The magistrate Judge's Order Granting Plaintiff's Motion to Compel (Doc. 39) is AFFIRMED as to the denial of Lexington's motion for leave to file a counterclaim and is REVERSED in so far as Lexington's motion for leave to add an affirmative defense of fraud was granted.

**IT IS SO ORDERED.**

Dated:  February 10, 2014

s/George Caram Steeh
GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
February 10, 2014, by electronic and/or ordinary mail.

s/Marcia Beauchemin
Deputy Clerk